UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————

№ 03-CV-5978 (JFB) (KAM)

———————

VALERIE KELSEY,
THEODORE GODDARD,
INDIVIDUALLY, AND AS CO-ADMINISTRATORS OF THE ESTATE OF CURTIS GODDARD,

Plaintiffs,

VERSUS

THE CITY OF NEW YORK,
P.O. THOMAS MARRONE, SHIELD #07784,
SERGEANT GEORGE KALLAS, SHIELD #01144,
LT. JAMES MARRON,
P.O. MICHAEL SYKORA, SHIELD #18496,
P.O. CORY FINK, SHIELD #14713,
P.O. MARTIN HALLIGAN, SHIELD #18367,
P.O. PAUL BERNAL, SHIELD #10349,
P.O. MATTHEW LINDNER, SHIELD #19417,
P.O. SHAWLINE SENIOR, SHIELD #02385,

Defendants.

———————

MEMORANDUM AND ORDER
December 18, 2006

———————

JOSEPH F. BIANCO, District Judge:

Plaintiffs Valerie Kelsey and Theodore Goddard bring this action on behalf of themselves and the estate of Curtis Goddard, alleging, *inter alia,* claims for violation of civil rights under 42 U.S.C. § 1983 and a pendent wrongful death/negligence claim under state law. Defendants move for summary judgment on all claims. For the reasons stated below, summary judgment is granted as to plaintiffs' claim alleging violation of § 1983. Further, with the dismissal of the federal claim from the instant lawsuit, the Court exercises its discretion to decline jurisdiction over the remaining state claim arising in negligence, and, thus, dismisses that claim without prejudice.

I. BACKGROUND

The following facts are undisputed unless otherwise indicated. On August 15, 2002, Curtis Goddard ("Goddard") arrived at and entered an apartment on Beach Channel Drive ("the apartment"), a residence at which Maria Buffamante ("Buffamante") lived with her children. (*See* Defs.' Rule 56.1 Statement of Material Facts ("Defs.' 56.1 Stmt."), ¶¶ 7, 11.) Goddard lived occasionally at the apartment as well, as Buffamante's boyfriend. (*See* Pls.' Rule 56.1 Statement of Material Facts ("Pls.' 56.1 Stmt."), ¶ 7; *see also* Defs.' 56.1 Stmt., ¶ 9.) On the previous day, August 14, 2002, Buffamante had informed Goddard that their relationship was over. (*See* Pls.' 56.1 Stmt., ¶ 10(a); *see also* Defs.' 56.1 Stmt., ¶ 10.) At the time Goddard entered the apartment, it was occupied by Buffamante, her children, and her friends Tyisha Safford, Leonar Jesus Espinal and an individual known as "Blue." (*See* Defs.' 56.1 Stmt., ¶ 8.) After Goddard entered the apartment, Buffamante, Espinal and "Blue" asked Goddard to leave the premises. (*See id.*, ¶ 12.) Goddard refused, and brandished a firearm.[1] (*See* Defs.' 56.1 Stmt., ¶ 13; *see also* Pls.' 56.1 Stmt., ¶ 13(b).)

New York City Police Department Sergeant George Kallas and Police Officers Thomas Marrone, Michael Sykora, Cory Fink, Martin Halligan, and Paul Bernal responded to a call regarding a dispute with a firearm at the apartment. (*See* Defs.' 56.1 Stmt., ¶ 5.) As the officers arrived at the apartment, "Blue" informed them that there was an individual with a gun inside the apartment. (*See* Defs.' 56.1 Stmt., ¶ 14; *see also* Pls.' 56.1 Stmt., ¶ 14.) Although it is disputed whether or not the police officers knocked on the apartment door, it is undisputed that the door was opened by Espinal, and the occupants of the apartment, save Goddard, ran out. (*See* Defs.' 56.1 Stmt., ¶ 15; *see also* Pls.' 56.1 Stmt., ¶ 15.) The officers entered the apartment, and observed Goddard run towards the kitchen.[2] (*See* Defs.' 56.1 Stmt., ¶ 16.)

The officers attempted to arrest Goddard in the kitchen, who resisted and refused to be handcuffed. (*See id.*, ¶ 17.) The officers were eventually successful in restraining and handcuffing Goddard. (*See id.*, ¶ 22.) The officers searched Goddard and seized a sock filled with ammunition, a ski mask, his gun, and a razor blade.[3] (*See* Defs.' 56.1 Stmt., ¶¶

---

[1] According to the deposition testimony of Buffamante, Goddard pulled his gun after he observed "Blue" reach into his pocket in a manner appearing to indicate that he was reaching for a knife. (*See* Declaration of K.C. Okoli ("Okoli Decl."), Ex. J at 71-73.) After he pulled the firearm, Goddard forced "Blue" to go out into the hallway outside the apartment, and then locked the door. (*See id.* at 73.)

[2] Plaintiffs dispute whether or not Sergeant Kallas followed the other officers into the apartment, but do not cite anything from the record to substantiate this claim, as required in a statement submitted pursuant to Rule 56.1. Local Civil Rule 56.1(d) ("Each statement made by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)."). Notwithstanding that defect, the Court notes that the factual dispute regarding whether Sergeant Kallas followed the other officers into the apartment has no bearing on the adjudication of the instant motion for summary judgment.

[3] Plaintiffs dispute the location from which these items were recovered. (*See* Pls.' 56.1 Stmt., ¶¶ 22-23, 28.) However, plaintiffs do not dispute the fact that these items were in fact seized by the

22-23, 28; *see also* Pls.' 56.1 Stmt., ¶¶ 22-23, 28.)

Goddard was escorted out of the apartment with his hands cuffed behind his back. (*See* Defs.' 56.1 Stmt., ¶ 24.) As he was being escorted out of the apartment, Goddard attempted to grab Officer Barnal's gun, while exclaiming "shoot me, kill me." (*See id.*, ¶ 25.) Officer Marrone held Goddard until he was able to confirm that Officer Bernal had control of his gun. (*See id.*, ¶ 26.) Goddard was brought out into the hallway, and was positioned facing the wall, approximately four to five feet from a stairwell door. (*See* Defs.' 56.1 Stmt., ¶ 27; *see also* Pls.' 56.1 Stmt., ¶ 27(a)). While placed facing the wall, Goddard was surrounded by Officers Sykora, Fink, Hallagan and Bernal in a semi-circle. (*See* Defs.' 56.1 Stmt., ¶ 29.) Sergeant Kallas instructed the officers to physically hold onto Goddard. (*See id.*, ¶ 30.) Pursuant to that order, Officer Sykora held onto Goddard while he was stood against the wall. (*See id.*, ¶ 32.)

Sergeant Kallas requested that the Emergency Services Unit and an ambulance respond to the scene to assist with an emotionally disturbed person (EDP). (*See* Defs.' 56.1 Stmt., ¶ 31; *see also* Pls.' 56.1 Stmt., ¶ 31.) Kallas and Lieutenant Marron then went down the hall to interview the occupants of the apartment. (*See* Defs.' 56.1 Stmt.,¶ 39.) After approximately five minutes, Goddard was turned around, so that he faced the surrounding officers. (*See* Defs.' 56.1 Stmt., ¶ 33.) Officer Sykora spoke to Goddard to ascertain what had happened prior to the arrival of the police at the apartment. (*See id.*)

---

officers from Goddard, which is all that is necessary to address the instant motion for summary judgment.

The parties agree that Goddard was relatively calm, although plaintiffs point to evidence in the record indicating that he was sweating and fidgety. (*See* Defs.' 56.1 Stmt., ¶ 34; *see also* Pls.' 56.1 Stmt., ¶ 34.) Officer Sykora released his physical hold on Goddard. (*See* Defs.' 56.1 Stmt., ¶ 35.) Goddard then made a sudden move at Sykora, and Officer Fink pushed Sykora out of the way, in order to prevent contact. (*See* Defs.' 56.1 Stmt., ¶¶ 36-37; *see also* Pls.' 56.1 Stmt., ¶¶ 36-37.) Goddard proceeded to escape from the officers, and ran towards the stairwell door. (*See* Defs.' 56.1 Stmt., ¶ 37.) According to defendants, Officer Shawline Senior was standing next to the stairwell door, and attempted to grab Goddard as he ran through the stairwell door, but failed.[4] (*See* Defs.' 56.1 Stmt., ¶ 38.)

---

[4] Plaintiffs assert that no officer attempted to grab Goddard when he escaped, citing the deposition testimony of Officer Fink. (*See* Pls.' 56.1 Stmt., ¶ 38.) That testimony proceeded as follows:

> Q. When Mr. Goddard came off the wall, did you attempt to grab him?
>
> A. No.
>
> Q. Did you see any officer attempt to grab him?
>
> A. No.

(Okoli Decl., Ex. D at 32.) On the other hand, defendants cite the deposition of Officer Senior, who testified that she attempted to grab Goddard but her hand slipped off his shirt, and Officer Bernal, who testified that he observed Goddard run through the door while being grasped by Officer Senior. (*See* Affirmation of Jennifer Rossan ("Rossan Decl."), Ex. J at 58; Ex. L. at 16-21.)

3

Sykora, Fink, Bernal, Halligan, Marrone, Lindner and Marron immediately chased after Goddard as he ran up the stairway to the rooftop of the building, while rear-cuffed. (*See* Defs.' 56.1 Stmt., ¶ 42.) Officer Sykora observed Goddard lean over a fence on the roof, and then twist his body so that he fell off the rooftop. (*See id.*, ¶ 44.) Goddard died as a result of injuries he assumed from the fall. (*See* Okoli Decl., Ex. O.)

The New York Police Department investigated the incident, and disciplined Officer Sykora for failing and neglecting to safeguard a prisoner, resulting in the loss of the prisoner. (*See* Pls.' 56.1 Stmt., ¶ 54.) The report noted that Sykora was responsible for securing Goddard, and that the circumstances warranted him physically holding on to Goddard. (*See* Okoli Decl., Ex. M.) Further, the report noted that it was Sykora's duty to maintain physical control of Goddard, since he was the one holding Goddard when Kallas gave him the order to not let go of him. (*See id.*) The same report investigated the actions of Fink, Kallas, Marrone, Halligan, Bernal, Linder, Senior and Marron, but found that discipline was not warranted as to those officers. (*See id.*)

Valerie Kelsey and Theodore Goddard, the co-administrators of Curtis Goddard's estate, filed the instant action, against the City of New York and the individual officers mentioned above, alleging causes of action under 42 U.S.C. §§ 1983 and 1985, based upon the following: (1) deliberate indifference to Goddard's safety needs; (2) the failure by the City to train and supervise the defendants; (3) the use of excessive force when handcuffing Goddard; and (4) a conspiracy by the defendants to not recapture Goddard after his escape from custody and/or a conspiracy to let Goddard fall from the rooftop. In addition, the complaint alleged a pendent claim for negligence arising under state law.

Defendants moved for summary judgment on all claims. In plaintiffs' opposition papers, they explicitly abandoned all claims except "1) damages for wrongful death based upon defendants' deliberate indifference to his safety needs, pursuant to 42 U.S.C. § 1983, and 2) damages for the wrongful death of the decedent due to the negligence of the individual defendants." (Pls.' Opp. Br., at 2.)

The case was re-assigned to the undersigned from the Honorable Carol B. Amon on February 10, 2006. The Court held oral argument on the instant motion as to the two remaining claims on August 11, 2006.

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (citation omitted); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (stating that

4

summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

III. DISCUSSION

As a threshold matter, the Court notes that defendants moved for summary judgment on all claims contained within the Amended Complaint. In their opposition papers, plaintiffs explicitly abandoned all of their claims, save two: (1) plaintiffs' claim under 42 U.S.C. § 1983 against the individual officers, alleging deliberate indifference to Goddard's safety needs under the Fourteenth Amendment; and (2) plaintiffs' state law negligence claim for the alleged wrongful death of Goddard, as against both the City of New York and the individual officer defendants. (*See* Memorandum of Law of Plaintiffs in Opposition to Defendants' Motion for Summary Judgment ("Pls.' Opp. Mem.") at 1-2.) The Court proceeds to address defendants' motion with respect to each of the remaining claims in turn.

A. Failure to Protect Under 42 U.S.C. § 1983

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979). Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983. For claims under § 1983, a plaintiff must prove "that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir.1999) (citation omitted).

Plaintiffs' remaining § 1983 claim alleges a violation of Goddard's substantive due process rights under the Fourteenth Amendment. Specifically, plaintiffs allege that the defendant officers failed to protect Goddard from himself, while he was in custody. When in the custody of police, an arrestee has the right to care and protection, including protection from suicide.[5] *Cook ex*

---

[5] The bulk of cases dealing with the right of a person in custody for protection from suicide analyze the issue as an Eighth Amendment claim dealing with the inadequate provision of medical care. *See, e.g., Woodward v. Correctional Medical Servs. of Ill., Inc.*, 368 F.3d 917, 926 (7th Cir. 2004); *Olson v. Bloomberg*, 339 F.3d 730, 735 (8th Cir. 2003). Although Eighth Amendment protections only apply to individuals who have been convicted, the Second Circuit has explicitly noted that pretrial detainees are protected by the Due Process Clause, and their rights to medical treatment are "at least as great as those of a

5

*rel. Estate of Tessier v. Sheriff of Monroe County, Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005) ("[P]retrial detainees like [plaintiff] plainly have a Fourteenth Amendment due process right 'to receive medical treatment for illness and injuries, which encompasses a right to psychiatric and mental health care, and a right to be protected from self-inflicted injuries, including suicide.'") (quoting *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994) (citations omitted)); *see also Hare v. Corinth, Miss.*, 74 F.3d 633, 647 & 648 n.3 (5th Cir. 1996) (collecting cases involving claims for failure to protect individuals in custody from suicide). In the detainee suicide context, the relevant inquiry is whether defendants were deliberately indifferent to the medical need of the detainee to be protected from himself. *See Weyant*, 101 F.3d at 856.

Defendants argue that summary judgment should be granted in their favor on plaintiffs' § 1983 claim because no jury could reasonably find that defendants acted with deliberate indifference to the safety needs of the decedent.[6] "'Deliberate indifference'

---

convicted prisoner." *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996) (citations omitted). "Thus, the official custodian of a pretrial detainee may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Id.* (citation omitted); *see also Cuoco v. Motisgugu*, 222 F.3d 99, 106 (2d Cir. 2000) (noting that standards from Eighth Amendment context apply to claims brought by pretrial detainees under the Fourteenth Amendment). Based on this logic, other Circuits have applied the same standards applicable to prisoner suicide cases arising under the Eighth Amendment to claims brought by individuals in custody prior to conviction under the Fourteenth Amendment. *See, e.g., Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty, Fla.*, 402 F.3d 1092, 1115 (11th Cir. 2005); *Barrie v. Grand Cty, Ut.*, 119 F.3d 862, 868 (10th Cir. 1997); *Partridge v. Two Unknown Police Officers of the City of Houston*, 791 F.2d 1182, 1187 n.20 (5th Cir. 1986).

---

[6] This argument assumes, *arguendo*, that the defendants owed a duty to protect to the plaintiff from himself at the time of the accident, even though he was no longer in their physical custody because of his escape. The general rule is that the Fourteenth Amendment solely imposes a limitation on the State's power to act, and does not create an affirmative obligation on the State to protect the public from harm. *DeShaney v. Winnebago Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989) ("[T]he Due Process Clauses [of the Fifth and Fourteenth Amendments] generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.") Since state actors did not directly kill the decedent—he committed suicide—in order for plaintiffs to proceed, they must demonstrate that they are not subject to the general rule that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197; *accord Pena v. DePrisco*, 432 F.3d 98, 107-08 (2d Cir. 2005). However, defendants concede that they did owe a duty when they had decedent in custody, based upon the "special relationship" theory of liability which escapes the general rule asserted by *DeShaney*, under which a State has a constitutional obligation to protect an individual from private actors. *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 533 (2d Cir. 1993). Under the "special relationship" theory, the Supreme Court and Second Circuit have both "recognized that a constitutionally significant special relationship generally involves some type of custody or other restraint on the individuals' ability to fend for themselves." *Matican v. City of New York*, 424 F. Supp. 2d 497, 504 (E.D.N.Y. 2006) (citing *DeShaney*, 489 U.S. at 200 ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."); *Ying Jing*

describes a mental state more blameworthy than negligence; but a plaintiff is not required to show that the defendant acted for the 'very purpose of causing harm or with knowledge that harm will result.'" *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)); *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003) ("[N]egligence is not deliberate indifference.") "Deliberate indifference is 'a state of mind that is the equivalent of criminal recklessness.'" *Hernandez,* 341 F.3d at 144 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). "[D]eliberate indifference involves unnecessary and wanton infliction of pain, or other conduct that shocks the conscience." *Hathaway,* 99 F.3d at 553 (2d Cir. 1996). In order for the plaintiffs to satisfy their burden to show deliberate indifference, they must demonstrate that each charged official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (quoting *Farmer*, 511 U.S. at 837); *accord Phelps v. Kapnolas*, 308 F.3d 180, 185-86 (2d Cir. 2002).

In the detainee suicide context, deliberate indifference may exist pursuant to one of two broad fact scenarios. *See Rellergert v. Cape Girardeau County, Mo.*, 924 F.2d 794, 796 (8th Cir. 1991). First, state officials could be deliberately indifferent to the risk of suicide by failing to discover an individual's suicidal tendencies. *See id.* (collecting cases). Alternatively, the detaining authorities could have discovered and have been aware of the suicidal tendencies, but could be deliberately indifferent in the manner by which they respond to the recognized risk of suicide, an inquiry which focuses on the adequacy of preventative measures. *See id.* In the instant case, defendants argue that they were not deliberately indifferent in either respect, specifically they argue: (1) that the decedent's acts were more "homicidal" than "suicidal," and so that plaintiffs cannot establish that defendants were deliberately indifferent to decedent's suicidal tendencies; and (2) that the actions of the officers in dealing with the threat of suicide were reasonable and did not exhibit "deliberate or willful lack of concern" to the safety needs of decedent.

As a threshold matter, the Court rejects defendants' argument that the record does not support a finding that the officers were aware of Goddard's suicidal tendencies. The defendants do not dispute that Goddard exclaimed "shoot me, kill me" to the defendant officers when he was trying to grab Officer Bernal's gun. (*See* Defs.' 56.1 Stmt.,

---

*Gan*, 996 F.2d at 533 ("Special relationships that have been recognized to give rise to a governmental duty to protect against third-person attacks have included custodial relationships such as a prison and inmate or a mental institution and involuntarily committed patient, and the relationship between a social service agency and a foster child.") Although the defendants concede that their affirmative action of taking Goddard into custody formed a special relationship which engendered a duty to protect, they argue that the "special relationship" and accompanying duty terminated at the moment that decedent voluntarily removed himself from custody by escaping. The defendants have not been able to provide any authority directly supporting the proposition that an individual's escape from custody terminates the duty to protect under the Fourteenth Amendment. However, the Court does not reach the issue of whether the duty is terminated because, even assuming *arguendo* that the defendant officers had a duty to protect the decedent, the facts of this case do not permit a jury determination of deliberate indifference, as discussed *infra*.

7

¶ 25.) Viewing that statement in a light most favorable to the plaintiffs, a reasonable jury could conclude that decedent was exhibiting a readily ascertainable desire to have his life ended through "suicide by cop." In fact, the actions of Sergeant Kallas support the conclusion that the defendant officers were aware of Goddard's suicidal tendencies because he requested emergency services to respond to assist with an emotionally disturbed person. Thus, the proper inquiry in the instant motion for summary judgment is whether a rational jury could find that insufficient preventative measures were taken by the defendant officers, such that they were deliberately indifferent to the risk of suicide.

Where officers take affirmative and deliberate steps to protect inmates from suicide, other circuits have generally found deliberate indifference lacking, even in the face of potentially negligent actions by the officers and/or a failure to comply with standard policies or procedures. For example, in *Rellergert*, 924 F.2d at 797, the Eighth Circuit assumed, drawing all inferences in favor of a plaintiff's jury verdict, that an officer let an inmate out of his sight with a bedsheet, notwithstanding the fact that the inmate was on suicide watch. The Eighth Circuit noted that the evidence supported the statement that the officer had conflicting responsibilities to which he had to attend, which prevented him from leaving his observation booth and monitoring the inmate. *See id.* Under these facts, the Eighth Circuit affirmed the district court's judgment notwithstanding the verdict, noting that while "the jury might reasonably conclude that [the defendant officer] acted imprudently, wrongly, or negligently," the evidence could not support a finding of deliberate indifference as a matter of law. *See id.* at 797-98.

Similarly, in *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001), the Fourth Circuit asserted the proposition that even where an officer is aware of the substantial risk of serious harm, he or she may avoid liability "if he responded reasonably to the risk of which he knew." The Fourth Circuit noted that the defendant officer had responded to the decedent's medical needs—volatility from drug withdrawal and a suicide risk of some kind—by placing him under "medical watch," which involved constant video surveillance. *See id.* Although it was noted that the officer failed to place the inmate in a paper gown, as was the ordinary custom with suicidal detainees, the court stated that the officer's failure to take certain precautions do not create a jury issue as to deliberate indifference "if his actions were nonetheless reasonable in response to the risk of which he actually knew." *Id.* The officer "simply took less action than he could have, and by his own admission, should have . . . at most [the defendant officer's] failure to take additional precautions was negligent, and not deliberately indifferent, because by placing [the decedent] on constant video surveillance, he simply did not 'disregard [] an excessive risk to [decedent's] health or safety.'" *Id.* at 390-91 (quoting *Farmer*, 511 U.S. at 837). Accordingly, the Fourth Circuit concluded that there was no basis for a reasonable finder of fact to conclude that the defendant officer acted with deliberate indifference. *See id.* at 391.

Moreover, in *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998), the Eighth Circuit held that prison officials did not demonstrate deliberate indifference and were entitled to qualified immunity where a detainee classified as a suicide risk was able to hang himself on a metal-framed electrical conduit in a temporary holding cell. In affirming the district court's decision to grant summary judgment for the defendants, the Eighth Circuit recognized the high burden imposed

by the deliberate indifference standard and emphasized that the court must closely examine the actions taken by the officials to prevent suicide, even if other steps were omitted:

> Appellant contends that the district court erred in focusing on the efforts which [the prison official] undertook. Instead, Appellant points to all of the actions which [the official] should have taken. Unfortunately, [the official] did not have the benefit of twenty-twenty hindsight, as we do now. Thus, we must examine those precautionary actions which were undertaken. Appellant seems to ignore the fact that [the official] did classify [the detainee] as a suicide risk, and he did take the preventive measures of placing him in the temporary holding cell and removing his shoes and belt. Additionally, [the official] periodically checked on [the detainee]. While [the official] may have been negligent in not checking on [the detainee] more often, or in failing to notice the exposed electrical conduit in the temporary holding cell, we cannot say as a matter of law that his actions were indifferent. To the contrary, [the official's] actions constituted affirmative, deliberate steps to prevent [the detainee's] suicide. Despite [the official's] ultimate failure to prevent that suicide, [the official] did not act with deliberate indifference.

*Id.* at 578.

Finally, in *Rhyne v. Henderson County*, 973 F.2d 386, 393-94 (5th Cir. 1992), the Fifth Circuit held that, as a matter of law, a jury could not find deliberate indifference where officials checked suicidal inmates only every ten minutes. The Fifth Circuit noted that, although under the facts of the case, periodic checks may have been in fact inadequate and could form the basis of a sound negligence claim, the periodic checks reflected concern, rather than apathy for inmate safety, and no evidence indicated that frequent periodic checks were obviously inadequate. *See id.*

Viewing the facts of this case in a light most favorable to the plaintiffs, even though the steps taken by the police in hindsight were insufficient to prevent Goddard from committing suicide, there is no reasonable basis for a jury to find that the defendant officers exhibited deliberate indifference to Goddard's safety needs. It is *undisputed* that the defendants took a number of affirmative steps towards protecting Goddard, including the following: (1) they seized dangerous items that he possessed, including a firearm and a razor blade; (2) they handcuffed him behind his back; (3) they called for the assistance of the Emergency Services Unit ("ESU"); (4) they cornered him against a wall in the hallway, surrounded by four police officers while they waited for ESU; and (5) after Goddard escaped, seven officers immediately chased him as he ran up the stairway to the roof. (*See* Defs.' 56.1 Stmt., ¶¶ 22-23, 27-29, 42; *see also* Pls.' 56.1 Stmt., ¶¶ 22-23, 27-29, 42.) These actions exhibited concern, rather than apathy, for Goddard's safety needs.

The real focus of plaintiffs' deliberate indifference claim is the failure of Officer Sykora to physically hold Goddard, rather than merely surrounding him with officers. Although in hindsight it may have been more prudent for Sykora to maintain a physical hold on Goddard, despite the fact that he appeared to be calming down, a reasonable finder of fact could not conclude that the steps taken

were obviously inadequate to the risk that Goddard would be able to extricate himself from custody and take his own life by running up the stairwell and jumping off the roof of the building.[7] *See Taylor v. Wausau Underwriters Ins. Co.*, 423 F. Supp. 2d 882, 896-97 (E.D. Wis. 2006) (finding lack of deliberate indifference as a matter of law where it was not foreseeable that the actions of the state official—allowing cell to be dark for a few minutes—would allow for decedent's suicide). In light of the significant steps taken to protect Goddard, including the belief that surrounding him against a wall would be sufficient to prevent him from escaping, the mere fact that these measures failed does not provide a basis from which a reasonable jury could conclude that the defendants were deliberately indifferent. *See Rellergert*, 924 F.2d at 797 ("It is deceivingly inviting to take the suicide, *ipso facto*, as conclusive proof of deliberate indifference. However, where suicidal tendencies are discovered and preventive measures taken, the question is only whether the measures taken were so inadequate as to be deliberately indifferent to the risk.").

Although plaintiffs place emphasis on the fact that Officer Sykora's decision to release his physical hold on Goddard was contrary to Sergeant Kallas' instruction, the failure to follow that instruction, by itself, does not provide a sufficient basis for a jury to find deliberate indifference. For example, in *Belcher v. Oliver*, 898 F.2d 32, 35-36 (4th Cir. 1990), the officers' failure to follow the instruction of the police chief to remove shoelaces and belts from prisoners resulted in a prisoner's suicide. In reversing the district court's denial of summary judgment, the Fourth Circuit noted that "a failure to carry out established procedures, without more, does not constitute 'deliberate disregard for the possibility' that [the prisoner] 'would take his own life.'" *Id*. at 36 (quoting *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir. 1983)). One would not generally view a handcuffed prisoner, whose weapons had been removed and was surrounded by police in a hallway, to be at risk for suicide. Given all the other steps taken by the officers to prevent Goddard from harming himself, the failure to follow Sergeant Kallas' instruction to hold Goddard cannot support a finding of "deliberate indifference" by a jury.[8]

---

[7] Although plaintiffs argue there is evidence that Officer Sykora knew the stairwell door was broken from previous experience in the building, plaintiffs have not pointed to any evidence in the record which would suggest that Sykora or the other police officers were aware that, if Goddard was able to escape to the stairwell doorway while handcuffed, he would be able to obtain ready access to the roof.

[8] To the extent that plaintiffs' claim of deliberate indifference attaches to the decision of Officer Fink to push Officer Sykora out of the way when decedent lunged at him, the Court notes that in that context of emergency situations in which officers must make quick decisions, a higher level of culpability is required to make a showing of deliberate indifference. *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998) ("[A]ttention to the markedly different circumstances of normal pretrial custody and high-speed law enforcement chases shows why the deliberate indifference that shocks in one case is less egregious in the other. . . . As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical . . .") (internal citations and footnote omitted). There is absolutely no evidence that Officer Fink sought to facilitate Goddard's escape by pushing Sykora out of Goddard's way as he charged forward; rather, the only evidence in the record, and the only reasonable inference from the facts, is that it was a sudden reaction to ensure officer safety. Consequently, the Court finds that the decision made by Officer Fink in the heat of the moment

In sum, had the officers acted differently, the tragedy of Goddard's death might have been prevented. The Court is cognizant of the great caution that district courts must exercise in granting summary judgment, especially where state of mind is the core issue. *See Bryant v. Maffuci*, 923 F.2d 979, 985 (2d Cir. 1991); *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985). However, the record does not include evidence from which a reasonable jury could find that the defendant officers were deliberately indifferent such that the plaintiffs' constitutional claim may proceed. Far from being deliberately indifferent, the officers took several steps, though insufficient in hindsight, to ensure Goddard would not hurt himself or others once in custody. A reasonable jury could not find deliberate indifference where the officers removed dangerous items from Goddard, handcuffed him, called for ESU, and surrounded him with at least four officers while waiting for ESU. As the Fourth Circuit noted in *Belcher,* "[w]e do not for one moment dismiss the pain of these events for those involved" and "hold only that their tragic character cannot be ameliorated by efforts to affix constitutional blame where it does not belong." *Belcher,* 898 F.2d at 36. That is precisely the situation here. Accordingly, summary judgment is granted with respect to plaintiffs' remaining claim arising under § 1983.[9]

---

out of his concern for officer safety cannot rise to the level of culpability required for a finding of deliberate indifference, as a matter of law.

[9] Defendants argue that, in deciding the motion for summary judgment, the Court should not consider the testimony of the police liability expert. Specifically, defendants assert that "the expert testimony is speculative, conjectural, illogical, and not grounded in any authoritative source or expertise." (Defendants' Reply Brief, at 18.) The Court finds that, even if the expert's testimony is admissible, the conclusory assertions contained therein are insufficient to create any issues of fact on the question of deliberate indifference.

## B. Qualified Immunity

Defendants also argue that, even if the Court found a constitutional duty to prevent someone from escaping custody and that their conduct violated Goddard's constitutional right to be free from harm to himself even after escaping custody, their conduct should still be entitled to qualified immunity. The Court agrees.

It is well settled that a police officer may be shielded from liability for civil damages if "his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights." *Mandell v. County of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003). "The availability of the defense [of qualified immunity] depends on whether a reasonable officer could have believed his action to be lawful, in light of clearly established law and the information he possessed." *Weyant v. Okst*, 101 F.3d at 858 (internal quotation marks, citation and alterations omitted).

Thus, when a qualified immunity defense is raised, a court must conduct a two-fold inquiry. First, the court must ascertain whether the facts, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Second, even if a constitutional right has been violated, the court should still find qualified immunity exists "'if either (a) the defendant's action did not violate clearly

established law, or (b) it was objectively reasonable for the defendant to believe that this action did not violate such law.'" *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003) (quoting *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250 (2d Cir. 2001)).

The Court has already concluded that, taking the proof in the light most favorable to plaintiffs, they have failed to demonstrate a violation of a constitutional right in this case under the deliberate indifference standard. Although the inquiry could end there, the Court will proceed to analyze the defendants' conduct under the second part of the qualified immunity test because it demonstrates that, even if Goddard's constitutional right was violated, the officers are entitled to qualified immunity.

Under the second part of the qualified immunity test, "[a] right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'" *Anderson*, 317 F.3d at 197 (alterations in original) (quoting *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998)); *accord LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998). Moreover, the right must be clearly established "in light of the specific context of the case." *Saucier*, 533 U.S. at 201.

As noted earlier, the Second Circuit has found that pretrial detainees have the right to medical treatment for serious medical needs under the Fourteenth Amendment, *see*, *supra*, note 5, which would clearly include treatment to prevent suicide. Thus, a pretrial detainee's right to be free from deliberate indifference by police officers to suicide, *while in custody*, is a clearly established right. Here, however, Goddard committed suicide after he escaped from police custody.[10] As discussed *supra*, the Court is unaware of any Supreme Court or Second Circuit cases which have found that a detainee has the right to medical attention, including prevention of suicide, *after* he has escaped from custody. *See, supra*, note 6; *see also Purvis v. City of Orlando*, 273 F. Supp. 2d 1321, 1327 (M.D. Fla. 2003) ("[Police officer] cannot be held accountable for [arrestee's] actions subsequent to his escape" where "[officer] had no way of knowing [arrestee] would jump the fences he jumped, or enter the retention pond where he drowned."). Although such a right may exist, the Court does not find any basis to conclude that such a right was "clearly established" at the time the incident took place in the instant case.

Even assuming *arguendo* that such a right was clearly established, the officers here would still be shielded by qualified immunity because it was objectively reasonable for them to believe that their conduct was not deliberately indifferent to Goddard's needs. *See McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004) ("[T]o establish their qualified immunity defense, the defendants must show that it was 'objectively reasonable' for them to believe that they had not acted with the requisite deliberate indifference.") (citation omitted). As noted earlier, the key decision being challenged here is Officer Sykora's decision not to maintain a hold on Goddard while they waited for ESU to arrive. Against

---

[10] In its earlier discussion of the duty owed to Goddard by defendants the Court assumed, without deciding, that Goddard remained in custody even after he had escaped. *See*, *supra*, note 6. The Court made that assumption for the sole purpose of considering plaintiffs' claim that defendants were deliberately indifferent toward Goddard's medical need.

12

the backdrop of the deliberate indifference standard, that decision cannot be viewed as objectively unreasonable in light of the other evidence in the case. *See Rellergert*, 924 F.2d at 797 ("While we conclude that the law is clearly established that jailers must take measures to prevent inmate suicides once they know of the suicide risk, we cannot say that the law is established with any clarity as to what those measures must be.") In particular, the officers took substantial steps to ensure Goddard's safety – they seized dangerous items from him, handcuffed him, called ESU, cornered him against a wall in the hallway, and surrounded him with officers. It is also undisputed that Officer Sykora was initially physically holding Goddard when he was standing facing the wall and, after approximately five minutes, turned Goddard outward to begin speaking with him in order to find out what had happened prior to the arrival of the police. (*See* Defs.' 56.1 Stmt., ¶¶ 32-33; *see also* Pls.' 56.1 Stmt., ¶¶ 32-33.) Although plaintiffs point to evidence that Goddard was sweating and fidgety, they also admit he was otherwise calm. (*See* Pls.' 56.1 Stmt., ¶ 34.)

Under such circumstances, the decision to release the physical grasp on Goddard in the hallway (especially when he had calmed down), while he was still handcuffed and surrounded by officers, should not deprive the officers of qualified immunity. In fact, one might conclude that, if the officers had continued to physically hold Goddard even after he calmed down, that could have agitated and unnecessarily provoked him, and exacerbated the situation, rather than de-escalating the situation by releasing the hold. This type of split-second judgment call in an extremely difficult situation is exactly the type of discretionary decision, within the bounds of objectively reasonable conduct under the deliberate indifference standard, that should be protected under the doctrine of qualified immunity. In particular, the Court notes that, unlike decisions by prison officials usually made under the controlled circumstances of a detention facility, *see supra*, the decisions here had to be made quickly in the context of a temporary detention in the hallway of a residential building. *See Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 309 (4th Cir. 2004) (finding that the defendant officers were not deliberately indifferent to the medical needs of an arrestee who died while in transport to a detention center where "the record . . . contains no evidence suggesting that these officers recognized that their actions were inappropriate *under the circumstances*") (emphasis added). These officers' inability to spend a substantial period of time deliberating about the best course of action in this uncontrolled hallway environment must be taken into consideration and, under the circumstances of the instant case, it is clear that the officers did not possess a sufficiently culpable state of mind to deprive them of qualified immunity. Accordingly, even if plaintiffs could establish that Goddard's constitutional rights were violated, the defendants would be entitled to dismissal of the claims under the doctrine of qualified immunity.

### C. Supplemental Jurisdiction

Having granted summary judgment dismissing plaintiffs' federal claim under §1983, the only remaining claim is plaintiffs' negligence claim arising under state law. Under 28 U.S.C. §1367(c)(3), the Court must consider whether it should continue to exercise jurisdiction over the remaining state claim. In determining whether to continue to retain jurisdiction, district courts consider factors such as judicial economy, convenience, fairness and comity. *See Nowak*

*v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1191 (2d Cir. 1996). Although a court possesses the discretion to retain jurisdiction, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity – will point toward declining to exercise jurisdiction over the remaining state – law claims." *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)); *Baylis v. Marriott Corp.*, 843 F.2d 658, 665 (2d Cir. 1988) ("When all bases for federal jurisdiction have been eliminated from a case so that only pendent state claims remain, the federal court should ordinarily dismiss the state claims.") (quoting *Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).

In the instant case, the Court exercises its discretion to decline jurisdiction over the remaining state claim. Although discovery has been completed and the instant case has proceeded to the summary judgment stage, it is not clear to the Court why the discovery would need to be repeated if the negligence claim is litigated in state court. *See Adee Motor Cars, LLC v. Amato*, 388 F. Supp. 2d 250, 255 (S.D.N.Y. 2005) (exercising discretion to decline jurisdiction over state claims after summary judgment was granted as to all federal claims, noting that there was no indication that discovery would need to be repeated). Moreover, addressing the plaintiffs' negligence claim would require this court to perform at least some non-obvious interpretations of New York State law, including, *inter alia*, whether plaintiffs' recovery is barred by what defendants allege was the commission of a class A misdemeanor, escape in the third degree, under *Johnson v. State*, 253 A.D.2d 274 (N.Y. App. Div. 1999), or whether decedent's emotional state removes this action from the ambit of *Johnson*. Resolution of this and similar issues is best left to state courts.[11] *Valencia*, 316 F.3d at 305 ("'[N]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.'") (quoting *Gibbs*, 383 U.S. at 726); s*ee also Rounseville v. Zahl*, 13 F.3d 625, 631-32 (2d Cir. 1994) (finding that although the state law at issue was well-settled, the application of the law to the facts of the case at hand was potentially novel and was therefore more appropriately resolved in state court); *Adee Motor Cars*, 388 F. Supp. 2d at 256 (refraining from exercising jurisdiction over remaining state claim and noting that resolution of the claim would "involve at least some nonobvious interpretations of New York state law . . . the resolution of these issues would be best left to state courts"). Finally, "since New York's CPLR § 205 allows a plaintiff to recommence a dismissed suit within six months without

---

[11] It is important to note that the Court's analysis of the officers' conduct under the "objectively reasonable" standard for purposes of addressing qualified immunity is not the same analysis that would be conducted under the state negligence standard. As noted earlier, the question of objective reasonableness for qualified immunity purposes is conducted against the backdrop of the "deliberate indifference" standard under the circumstances of this case. In other words, the question is whether an objectively reasonable officer could believe that he was not being deliberately indifferent to Goddard's needs. *See McKenna*, 386 F.3d at 437. That analysis is obviously different than simply examining whether an officer's conduct was negligent under state law. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) ("'Deliberate indifference' describes a mental state more blameworthy than negligence.").

regard to the statute of limitations, plaintiff[s] will not be unduly prejudiced by the dismissal of [their] state law claims." *Trinidad v. New York City Dept. of Correction*, 423 F. Supp. 2d 151, 169 (S.D.N.Y. 2006) (citing *Mayer v. Oil Field Systems Corp.*, 620 F. Supp. 76, 77-78 (S.D.N.Y. 1985)). Accordingly, plaintiffs' state law claim is dismissed without prejudice.

IV. CONCLUSION

For the foregoing reasons, summary judgment is GRANTED as to plaintiffs' federal claims arising under 42 U.S.C. § 1983. Further, pursuant to 28 U.S.C. §1367(c)(3), the Court declines to retain jurisdiction over the remaining claim arising under state law, and dismisses such claim, without prejudice. The Clerk of the Court shall close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: December 18, 2006
Central Islip, New York

\* \* \*

The attorney for plaintiffs is Kenechukwu Chudi Okoli, Esq., 330 Seventh Avenue, 15th Floor, New York, New York 10001. The attorneys for defendants are Jennifer Amy Rossan, Esq., Assistant Corporation Counsel of the City of New York for Michael A. Cardozo, Esq., Corporation Counsel of the City of New York, 100 Church Street, New York, New York 10007.